HMR-28-2006  12:06         KASOWITZBENSON        Nov  6 2001  16:17      P.02
P.02/13

F I L E D
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2006 MAY -2  PM 2: 20

GREGORY C. LANGHAM
CLERK

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------x

THE UNOFFICIAL ON-SHORE
CREDITORS' COMMITTEE OF THE
BAYOU FAMILY OF COMPANIES,

                        Plaintiff,

v.

BAYOU GROUP, LLC, *et al.*,

                        Defendants.

-------------------------------------------x

06 MDL 1755  BY _____ DEP. CLK
(CM)

No.: 7:06-cv-02379-UA

# 06-MC-0024

## [PROPOSED] ORDER GRANTING THE UNOFFICIAL ON-SHORE CREDITORS' COMMITTEE'S MOTION TO APPOINT A RECEIVER

Plaintiff Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies'

(the "Committee") Motion to Appoint a Receiver (the "Motion") came before the Court on

April 28 ~~March __~~, 2006, at _____, after due notice of the hearing, and consideration of the argument of

counsel and the following pleadings:

    1.     Committee's Motion and memorandum in support thereof;

    2.     Declaration of the Chair of the Committee, Jonathan J. Fisher, in support of the

Motion; and

    3.     The Declaration of Joseph A. Gershman in support of the Motion.

After consideration of the record, the Court finds that entry of this Order Granting the

Unofficial On-Shore Creditor's Committee's Motion to Appoint a Receiver is warranted under

Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 thereunder, state law

claims of fraud and breach of a fiduciary duty, Federal Rule of Civil Procedure 66, and the facts

and circumstances of this case.

**NOW, THEREFORE, IT IS HEREBY ORDERED** as follows:

**A.**
**APPOINTMENT OF RECEIVER**
**AND PROPERTY OF THE RECEIVERSHIP ESTATE**

1.      Pursuant to 28 U.S.C. §§ 754 and 959, Federal Rule of Civil Procedure 66 and this Court's inherent authority, the Court hereby **APPOINTS** Jeff J. Marwil, an attorney at law of the State of Illinois, to be the federal equity receiver (in such capacity, the "<u>Receiver</u>") of BAYOU GROUP, LLC, a Connecticut Limited Liability Company, BAYOU MANAGEMENT, LLC, a New York Limited Liability Company, BAYOU SECURITIES, LLC, a New York Limited Liability Company, BAYOU ADVISORS, LLC, a Delaware Limited Liability Company, BAYOU EQUITIES, LLC, a Delaware Limited Liability Company, BAYOU FUND, LLC, a New York Limited Liability Company, BAYOU SUPERFUND, LLC, a Delaware Limited Liability Company, BAYOU NO LEVERAGE FUND, LLC, a Delaware Limited Liability Company, BAYOU AFFILIATES FUND, LLC, a Delaware Limited Liability Company, and BAYOU ACCREDITED FUND, LLC, a Delaware Limited Liability Company (collectively, the "<u>Bayou Entities</u>" or the "<u>Receivership Estate</u>").

2.      Except as provided in paragraphs 4 and 5 of this Order, the Receiver shall be, and is hereby, vested with complete jurisdiction and control over all of the Bayou Entities': (a) real property, equitable property, tangible and intangible personal property, interests, or assets of any nature, wherever located; and (b) claims, demands or causes of action of any kind, character or description, regardless of the legal principle or theory upon which the same may be based, whether known or unknown, liquidated or unliquidated, contingent or absolute, accrued or unaccrued, matured or unmatured, insured or uninsured, joint or several, determined or undetermined, determinable or otherwise (collectively, the "<u>Bayou Assets</u>").

2

3.      Pursuant to 28 U.S.C. § 754, the Receiver shall, to the extent practicable, within ten (10) days following entry of this Order, file copies of the Committee's Complaint, dated March 27, 2006, and of this Order, with the Clerk of the District Court for every federal judicial district in which the Receiver has reason to believe Bayou Assets may be found (the "Receivership Filings").  Notwithstanding the ten-day time limitation set forth in 28 U.S.C. § 754, the Receiver may apply to the Court for an extension of time within which to complete the Receivership Filings.  Subject to the Court's discretion, such applications shall be freely granted to enable the provisions of this Order to be carried out.

4.      Any property, interests or assets that would otherwise be Bayou Assets but are subject to an order of civil or criminal forfeiture ("Forfeited Bayou Assets") entered by a court of competent jurisdiction of any State or of the United States (a "Forfeiture Order") shall not be Bayou Assets.

5.      Nothing in this order shall be construed to vest the receiver with any property, interests or assets, including claims and causes of action, that is within the jurisdiction of liquidation proceedings now pending in the Cayman Islands known as *In re Bayou Off-shore Master Fund, Ltd. et al*, Nos. [2005] 397 etc., (Grand Ct., September 2, 2005) (Cayman Islands) ("Off-shore Assets"), provided that if a Bayou Asset was commingled with Off-Shore Assets, and/or the receiver cannot otherwise determine or agree as to whether an asset is a Bayou Asset or an Off-Shore Asset, this Court shall have jurisdiction to determine any dispute relating thereto.

## B.
## RECEIVER'S AUTHORITY AND DUTIES

6.      Except for the Forfeited Bayou Assets and the Off-shore Assets, which are expressly not included within the Bayou Assets, the Court hereby vests the Receiver with

3

authority and jurisdiction over the Receivership Estate and the Bayou Assets to the maximum extent permitted by 28 U.S.C. §§ 754, 959 and 1692, Federal Rule of Civil Procedure 66 and this Court's inherent powers, and hereby empowers and permits the Receiver to take any and all actions necessary and proper to carry out the express provisions of this Order.

7.   Without limiting the generality of the foregoing expressions of the Receiver's authority over the Receivership Estate and the Bayou Assets, the Receiver is specifically authorized, empowered, and directed to perform the following duties and responsibilities, at all times with a view towards (a) locating, preserving, and protecting the Bayou Assets; and (b) distributing the Bayou Assets that the Receiver collects as expeditiously as possible to creditors (including investors) of the Bayou Entities, pursuant to further order of this Court:

   a.   *Management of Assets:* Manage and administer the Bayou Assets as is necessary or required to comply with and effectuate the directives of this Order;

   b.   *Identification and Evaluation of Claims That May Be Asserted By the Bayou Entities and Identification of Possible Creditors of the Bayou Entities:* Investigate past operations and transactions of the Bayou Entities so as to (1) determine what claims, if any, may be asserted on behalf of the Bayou Entities; and (2) obtain all necessary records that relate to any entity that ever loaned money, extended credit to, or invested or had interests in the Bayou Entities or the Bayou Assets; (3) notify any entity that may have an interest in the Bayou Entities or the Bayou Assets of the current proceedings, providing those entities the opportunity to submit material establishing the nature and amount of their investment; present to the Committee within 120 days of the date of this Order, or on such other date as the Committee and the Receiver may agree, a confidential report detailing the nature of any claims that may be asserted on behalf of the Bayou Entities, all persons that may have an interest in the Bayou Assets, and all persons who have directly or indirectly received or are in possession of any Bayou Assets;

   c.   *Secure, Manage, and Discontinue Ongoing Business Operations:* Secure the business premises, business equipment, data, and documents of the Bayou Entities; take control of all means of communication with clients, investors, vendors, agents, and others doing business with the Bayou Entities; take all reasonable and necessary actions to wind-down and liquidate the business operations of the Bayou Entities, *provided that* if the

4

government claims any government privilege with respect to any data or documents, this Court shall have exclusive jurisdiction to determine any dispute arising therefrom;

d.    *Institute, Defend, Compromise, or Settle Legal Actions*:  After consulting with the Committee or its successor, evaluate, institute, assert, prosecute, defend and compromise and settle claims and causes of action on behalf of the Receivership Estate, as well as claims and causes of action for fraudulent conveyance on behalf of the Receivership;

e.    *Corporate Governance*:  Pursuant to 28 U.S.C. § 959(b), succeed to be the sole and exclusive managing member and representative of each of the Bayou Entities with the sole and exclusive power and authority to manage and direct the business and financial affairs of the Bayou Entities, including without limitation, the authority to petition for protection under the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"), for any or all of the Bayou Entities and in connection therewith be and be deemed a debtor-in-possession for any or all of the Bayou Entities in proceedings under Chapter 11 of the Code, and prosecute such adversary proceedings and other matters as may be permitted under the Code and/or applicable law;

f.    *Issuing Payments, Authorizing Expenses, Entering into Agreements, and Retaining Professional Services*:  The Receiver, on behalf of the Bayou Entities, may:

   (1)    Incur obligations and/or authorize such expenses as the Receiver deems reasonable and necessary in discharging the Receiver's duties;

   (2)    Enter into contracts, including financing contracts secured by the Bayou Assets, as the Receiver deems reasonable and necessary in discharging the Receiver's duties; and

   (3)    Retain persons to render professional services, including attorneys, accountants, securities professionals, and others as the Receiver deems reasonable and necessary in discharging the Receiver's duties (the "Professionals");

*provided, however*, if the Receiver knows or reasonably believes the expenses incurred or will be incurred (exclusive of the Fee referenced in Paragraph 8) as a result of an action taken pursuant to this subsection will exceed $25,000 (Twenty Five Thousand Dollars and No Cents) ("Large Expenses"), the Receiver shall, prior to incurring the Large Expense or entering into any such contract or retention agreement that will or may result in a Large Expense, obtain consent therefore from the Committee or its successor.  To the extent that: (1) the cumulative expenses exceed

$50,000 for which the Receiver has not obtained consent; or (2) the Receiver determines that an expense that the Receiver previously believed to be less than $25,000 will in fact exceed $25,000, the Receiver will immediately notify and obtain the consent of the Committee. In the event that circumstances occurred such that the Receiver incurred a Large Expense prior to receiving the Committee's consent therefore, the Committee may provide the consent required by this subsection on a retroactive basis without prejudice to either the Committee or the Receiver. Any disputes arising between the Committee and the Receiver regarding Large Expenses shall be subject to the dispute resolution procedure described in paragraph 9 of this Order as if the disputed Large Expense was an Expense Summary (as defined herein).

g.  *Access to Corporate Documents and Computers*: Access to all documents, books, and records of the Bayou Entities as necessary to fulfill the receiver's duties as set forth herein, provided that if the government claims any government privilege with respect to such access, this Court shall have exclusive jurisdiction to determine any dispute arising thereto;

h.  *Liquidation Plan*: Unless a case is filed under the Code at the direction of the Receiver on behalf of the Bayou Entities within 180 days of this Order, or on such other date and the Committee and the Receiver may mutually agree, develop a plan for liquidation and distribution of the Bayou Assets in conjunction with and in consultation with the Committee or its successor (the "Receiver's Plan"), which shall be submitted to this Court for approval;

i.  *Negotiate with the United States and any State of the United States*: To the extent that any State or the United States has obtained a Forfeiture Order and is in possession of Forfeited Bayou Assets, to confer with the Attorney General of the United States (or his designees) or the appropriate State agency and coordinate the Receiver's Plan to the maximum extent possible with any plan of distribution of the Forfeited Assets;

j.  *Distribution Fund*: Open a custodial account (the "Distribution Fund") at a federally insured bank to receive and hold all cash assets that the Receiver collects and receives;

k.  *Investment of Distribution Fund*: Upon consulting with and obtaining consent from the Committee or its successor, invest and reinvest the Distribution Fund with a view toward (i) conserving and preserving the principal; and (ii) maximizing the investment return; and

l.  *Taxes*: Pay all local, state, and federal taxes as required by the applicable tax authority and in accordance with the applicable tax regulations.

C.

6

APR-28-2006  12:08        KASOWITZBENSON                    Nov  6 2001  16:18      P.08
                                                                                 P.09/12

## RECEIVER'S COMPENSATION, COSTS, AND FEES

8.     The Receiver shall be entitled to payment for all reasonable costs, fees, and other expenses incurred in the performance of his or her duties as shall be approved by this Court.

9.     The Receiver shall be paid a reasonable fee (the "Fee") for his services which shall be the greater of:  (a) $20,000 per month (payable monthly) from the date of his appointment until the final order winding up the receivership or any case filed under the Code by or on behalf of the Bayou Entities; or (b) 2% of the net amount of funds distributed under the Receiver's Plan or pursuant to a distribution scheme approved in any case filed under the Code by or on behalf of the Bayou Entities; *provided, however*, in determining the net amount of funds distributed under the Receiver's Plan, any assets that are distributed under the Receiver's Plan directly or indirectly that are the subject of a Forfeiture Order, including without limitation the approximately $100 million that the Arizona Attorney General previously seized, shall not be considered.  In addition, on a monthly basis, the Receiver shall be reimbursed for all reasonable costs and expenses paid and incurred by the Receiver in the performance of his duties ("Expenses").

10.    Prior to applying to the Court for reimbursement of Expenses, the Receiver shall submit to the Committee his invoices for Expenses and appropriate supporting documentation in reasonable particularity ("Expenses Summary"), together with a status report of the Receiver's activities and actions during the applicable time period.  Within ten (10) days of submission to the Committee, the Committee shall either approve, reject, or inquire regarding the Expense Summary.  Should the Committee inquire regarding the Expense Summary, the Receiver and the Committee shall make good faith efforts to resolve any issues within ten (10) days of the inquiry.  Upon the Committee's final action regarding a particular Expense Summary, the Receiver shall

APR-28-2006  12:08      KASOWITZBENSON.                                    P.09/12

promptly submit the Expenses Summary to this Court on such notice as the Court may direct,

indicating whether the Committee approved or rejected the Expenses. If the Committee rejected

some and/or all of the Expenses, the Committee may, but is not required to, make a separate

submission explaining the basis of its rejection. If either the Committee or any other person

objects to some and/or all of the Expenses, this Court must approve such disputed Expenses,

after such hearing as the Court may direct, before the Receiver pays the amount requested. If the

Committee has approved the Expenses, and no other person files an objection to such Expenses

Summary with the Court within ten (10) days of notice thereof, the Receiver is authorized to

reimburse and/or pay the Expenses without further order of the Court.

     11.    The funds necessary to pay and satisfy the Bayou Entities' obligations, including

payment of the Receiver's Fee and Expenses, shall be paid: (a) from loans and extensions of

credit obtained by the Receiver on behalf of and for the benefit of the Bayou Entities; (b) from

the Distribution Fund; and/or (c) in accordance with the Receiver's Plan or such other

distribution scheme as may be approved by a court of competent jurisdiction.

### D.
### INJUNCTION AND STAY OF ENFORCEMENT ACTIONS

     12.    For a period of ninety (90) days from the date of this Order, subject to an

extension by this Court, all persons who receive actual notice of this Order are hereby stayed (the

"Stay") and prohibited from directly or indirectly:

        a.    Commencing or continuing any civil judicial, administrative, or other
            action or proceeding of any kind against the Bayou Entities;

        b.    Creating, perfecting or enforcing any lien, claim, encumbrance or interest
            in, upon or to any of the Bayou Assets;

        c.    Obtaining possession or control over any of the Bayou Assets, whether by
            foreclosure or otherwise; and

d.      Using self-help, set-off or executing or issuing any attachment, subpoena, replevin, execution or other process for the purpose of impounding or taking possession of or interfering with, invading or disturbing any of the Bayou Assets.

Provided that, this Paragraph shall not apply to (1) any governmental agencies, entities, or units or (2) the Joint Official Liquidators for the Bayou Off-Shore Entities with respect to subparagraphs (b), (c) or (d) as to any property, interests or assets, including, without limitation, claims and causes of action, that are in dispute between the parties.

13.     On request of a party in interest, and expedited notice and hearing, the Court may grant relief from the Stay imposed by paragraph 12 of this Order for good cause shown.

14.     This Order shall not affect, impair or modify any person's rights or remedies under applicable law, contract or otherwise, except as specifically set forth herein.

### E.
### GENERAL PROVISIONS

15.     The Receiver may be removed at any time by the Court, or upon the request of the Committee or its successor for cause, as approved by the Court, and a successor shall be named by the Court, after notice to the Committee or its successor. In the event that the Receiver resigns from office, the Receiver shall first provide written notice to the Committee or its successor, and such resignation shall not be effective until the Court appoints a successor under such conditions as the Court may order.

16.     The Receiver, together with any Professionals retained by the Receiver pursuant to this Order, shall be entitled to rely on all outstanding rules of law and court orders and shall not be liable to anyone for his or their own good faith compliance with any order, rule, law, judgment, or decree, including those issued or enacted in foreign jurisdictions.

9

APR-26-2006  12:09    KASOWITZBENSON

17.    In no event shall the Receiver be liable to anyone for his good faith compliance with the duties and responsibilities as Receiver.  Nor shall the Receiver be liable to anyone for any actions taken or omitted by him except on a finding by this Court that he acted or failed to act as the result of misfeasance, bad faith, gross negligence, or in reckless disregard of his duties.

18.    This Court shall have exclusive jurisdiction over: a) any claims made by any person against the Receiver for any actions or omission related to the Bayou Entities or the Bayou Assets; and b) any claims made by any person against any Professional with respect to that Professionals' execution of their respective duties as directed by the Receiver.

19.    The Receivership Estate shall indemnify and hold harmless the Receiver with respect to any or all claims, rights and causes of actions of every type or nature whatsoever relating or referring in any manner to the Bayou Entities or the Bayou Assets ("Indemnity Claims") unless this Court finds the Receiver breached any duty as specified in Paragraph 17. The Receivership Estate shall further indemnify the Receiver for, and advance, reasonable costs and attorneys' fees in defending against, any Indemnity Claims; *provided, however,* to the extent that this Court finds that the Receiver breached any duty as specified in Paragraph 17, the Receiver shall immediately repay any advanced defense costs or attorneys' fees.

20.    To the extent the Receiver pays Indemnity Claims and/or fees, costs or expenses in connection therewith pursuant to Paragraph 19, he shall be entitled to recover all such amounts paid from the Distribution Fund and/or the Bayou Assets on a super priority basis with the right of distribution senior and prior to the claims or interests of creditors (including investors) of the Bayou Entities.

21.    The Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary duties and obligations in this matter unless and until this Court so orders after due notice and hearing.

22.    Except as expressly stated herein, nothing in this Order shall be construed to impair, limit, or constrain the Receiver's powers under any Federal Rule of Civil Procedure, any statute of the United States or any decisional authority construing the powers of or procedural mechanisms available to federal equity receivers.

23.    The Court retains jurisdiction with respect to any matters addressed in this Order, including without limitation any and all matters relating to or affecting the Receivership Estate, the Bayou Assets, the Receiver and the scope of authority granted the Receiver hereunder.

DONE IN OPEN COURT this 28 day of ~~March,~~ April 2006.

_____
The Honorable Ceilee McNul
United States District Judge

Dated: 4/28/06

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

THE UNOFFICIAL ON-SHORE
CREDITORS' COMMITTEE OF THE
BAYOU FAMILY OF COMPANIES,

                  Plaintiff,

v.

BAYOU GROUP, LLC, a Connecticut
Limited Liability Company, BAYOU
MANAGEMENT, LLC, a New York
Limited Liability Company, BAYOU
SECURITIES, LLC, a New York Limited
Liability Company, BAYOU ADVISORS,
LLC, a Delaware Limited Liability
Company, BAYOU EQUITIES, LLC, a
Delaware Limited Liability Company,
BAYOU FUND, LLC, a New York
Limited Liability Company, BAYOU
SUPERFUND, LLC, a Delaware Limited
Liability Company, BAYOU NO
LEVERAGE FUND, LLC, a Delaware
Limited Liability Company, BAYOU
AFFILIATES FUND, LLC, a Delaware
Limited Liability Company, BAYOU
ACCREDITED FUND, LLC, a Delaware
Limited Liability Company, SAMUEL
ISRAEL, III, and DANIEL MARINO,

                  Defendants.

-------------------------------------------------------x

06-cv-

## 06 CIV. 2379

## COMPLAINT

    Plaintiff, The Unofficial On-Shore Creditors' Committee of the Bayou Family of

Companies (the "Committee"), states as follows:

## I. INTRODUCTION

    1.    Defendants, through their management entity, Bayou Management, LLC

(collectively, "Bayou"), operated a family of fraudulent hedge funds (the "Bayou Funds") from

approximately 1997 through 2005.

    2.    The Committee is composed of investors of Bayou who deposited funds with one

or more of the Defendants with a contractual right to redeem their investments on demand (the "Creditors"). The Defendants announced the liquidation of the Bayou Funds in July 2005, but to date no funds have been returned to Creditors.

3.    The Committee is informed and on that basis believes that Defendants originally operated a legitimate hedge fund that sought to maximize returns with limited risk by pursuing an aggressive trading strategy. Defendants' strategy was flawed and Bayou began losing money almost immediately. Those losses continued throughout the life of the Bayou Funds.

4.    To conceal those losses from Creditors and potential investors, Defendants misstated earnings, disseminated false accounting statements, created a phony accounting firm to "audit" fictitious annual financial statements, and routinely provided Creditors materially false and misleading information about the performance of the Bayou Funds.

5.    Although the Bayou Funds were suffering substantial annual losses, Defendants continued to aggressively pursue new Creditors and new deposits. New deposits offset the losses the Bayou Funds suffered, redemptions and fictitious profits paid to withdrawing Creditors, and funds misappropriated by Defendants.

6.    Eventually, Bayou collapsed under the weight of increasing trading losses, large numbers of Creditor redemptions, and exorbitant commissions paid to Defendants. In May 2005, the Attorney General of Arizona seized at least $100 million in Bayou funds in an Arizona state court proceeding. This seizure precipitated Bayou's failure and the Bayou principals announced the liquidation of the Bayou Funds in July 2005.

7.    On September 1, 2005, the United States commenced civil forfeiture proceedings in this Court. *United States v. Bayou et al.*, No. 05 Civ. 7722. Defendants Israel and Marino later pleaded guilty to criminal securities fraud and conspiracy charges. *United States v. Israel*,

2

No. 05 CR 1036. Simultaneously, the Securities and Exchange Commission ("SEC") and the Commodity Future Trading Commission ("CFTC") initiated separate civil law enforcement actions against the Bayou Funds and their principals in this Court. *CFTC v. Bayou Management et al.*, No. 05 Civ. 8374; *SEC v. Israel et al.*, No. 05 Civ. 8376. Numerous civil actions followed and are currently pending in various state and federal courts against one or more of the Defendants. Despite a plethora of lawsuits, no Bayou Creditor has received any monies since Defendants announced they were liquidating the Bayou Funds.

## II.    THE PARTIES

**A.    Plaintiff On-Shore Creditors' Committee of the Bayou Family of Companies.**

8.    The voting members of the Committee are composed of the five largest representative members of the on-shore unsecured creditors of Bayou willing to serve. The unsecured creditors all deposited funds with Bayou for investment in the on-shore Bayou Funds. The Committee's purpose is to advocate for the common interests of creditors holding unsecured claims against one or more of the on-shore entities comprising the Bayou family of companies.

**B.    Defendants**

9.    Defendant Bayou Group, LLC ("Bayou Group") is a limited liability company organized under the laws of Connecticut having its last known principal offices at 40 Signal Road, Stamford, CT 06902. The Bayou Group is a family of companies and individuals that created, operates, and controls the Bayou Funds.

10.    Defendant Bayou Management, LLC ("Bayou Management") is a limited liability company organized under the laws of New York and having its last known principal offices at 40 Signal Road, Stamford, CT. Bayou Management served as the investment advisor to, and manager of, the Bayou Funds.

3

11.     Defendant Bayou Securities, LLC ("Bayou Securities") is a limited liability company organized under the laws of New York having its last known principal offices located at 40 Signal Road, Stamford, CT 06902.  Bayou Securities LLC is a broker-dealer registered with the SEC and is a member of the National Association of Securities Dealers ("NASD").  Bayou Securities is part of the Bayou Group and performed securities brokerage and trading services for the Bayou Funds.

12.     Defendant Bayou Advisors, LLC ("Bayou Advisors") is a Delaware limited liability company with its last known mailing address at 40 Signal Road, Stamford, CT 06902.  Bayou Advisors is a member of the Bayou Group.

13.     Defendant Bayou Equities, LLC ("Bayou Equities") is a Delaware limited liability company with its last known mailing address at 40 Signal Road, Stamford, CT 06902.  Bayou Equities is a member of the Bayou Group.

14.     The Bayou Funds include the following funds:

a.      Defendant Bayou Fund, LLC ("Bayou Fund"), which is a limited liability company organized under the laws of New York with its last known principal offices at 40 Signal Road, Stamford, CT 06902 and at Faust Rabbach & Oppenheim, LLP, 488 Madison Avenue, New York, NY 10022;

b.      Defendant Bayou Super Fund, LLC ("Bayou Super Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT 06902;

c.      Defendant Bayou No Leverage Fund, LLC ("Bayou No Leverage Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT 06902;

4

d.     Defendant Bayou Affiliates Fund, LLC ("Bayou Affiliates Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT 06902; and

e.     Defendant Bayou Accredited Fund, LLC ("Bayou Accredited Fund"), which is a limited liability company organized under the laws of Delaware with its last known principal offices at 40 Signal Road, Stamford, CT.

15.     Defendant Samuel Israel, III ("Israel") is a founder and principal of the Bayou Group, Bayou Management, Bayou Securities, Bayou Partners, Bayou Advisors, Bayou Equities and the Bayou Funds. He was, at all relevant times, the Managing Member of Bayou Management and a registered representative with Bayou Securities. Israel is a citizen of New York and his last known address was 4 Bryan Brook Lane, Armonk, NY 10504.

16.     Defendant Daniel Marino ("Marino") was, at all relevant times, the Chief Financial Officer and Chief Operating Officer of Bayou Group and Bayou Management, and was a fund manager for the Bayou Funds. Marino is also the owner and registrant for Richmond-Fairfield Associates. Defendant Marino is a citizen of Connecticut and his last known address was at 128 Daskams Lane #2B, Norwalk, CT 06851.

## C.     Off-Shore Investors

17.     In October and November 2003, Israel and Marino created seven Cayman Islands exempted limited companies related to the Bayou Funds: the Bayou Off-Shore Master Fund and Bayou Off-Shore Funds A, B, C, D, E, and F (the "Off-Shore Bayou Funds"). It appears that Bayou Off-Shore Funds A, B, C, D, E, and F were to serve as feeder funds for the Bayou Off-Shore Master Fund, which in turn sent funds to defendant Bayou Management. The Bayou.Off-Shore Funds are separate and distinct entities from the Bayou Funds that are the subject matter of

this Complaint. In August 2005, the managing shareholders of the Off-Shore Bayou Funds commenced liquidation proceedings in the Grand Court of the Cayman Islands. The Grand Court appointed Gordon I. Macrae and G. James Cleaver of Kroll (Cayman) Ltd. as joint liquidators (the "Kroll Liquidators").

### III.   JURISDICTION AND VENUE

18.   Claim I arises under the provisions of the Securities Exchange Act of 1934, 15 U.S.C. §78a *et seq.* (the "1934 Act."). Subject matter jurisdiction of this Claim arises under 15 U.S.C. §78aa and 28 U.S.C. § 1331. The remaining claims arise under state law, and this Court has subject-matter jurisdiction over these claims pursuant to 28 U.S.C. § 1367.

19.   Venue in this Court is proper pursuant to 15 U.S.C. §78aa and 28 U.S.C. § 1391 because acts or transactions constituting violations of provisions of Section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, occurred in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

20.   As venue lies in this district under 15 U.S.C. §78aa, Defendants are subject to personal jurisdiction in this Court wherever they may be found pursuant to the same statute. This Court also has personal jurisdiction over all Defendants who reside in the State of New York, who have engaged in business activities in New York, and who have engaged in tortious conduct within New York such that this Court's exercise of its jurisdiction over the Defendants does not offend traditional notions of fair play and substantial justice.

### IV.   FACTS RELEVANT TO ALL CLAIMS FOR RELIEF

**A.   Creation of the Bayou Funds.**

21.   In June 1996, Israel and Marino founded the Bayou Group and opened their first hedge fund, the Bayou Fund. The Bayou Fund began taking investors in January 1997. Israel

subsequently added Bayou Securities and Bayou Management to the Bayou Group in 1997 and

Bayou Advisors and Bayou Equities to the Bayou Group in 2001.

22.    In January 2003, Bayou Management liquidated the Bayou Fund and created four

separate funds—Bayou Accredited, Bayou Affiliates, Bayou No Leverage and Bayou

Superfund—all registered as Delaware limited liability companies.

23.    Bayou represented to investors that the goal of the funds was to provide steady,

above-average market returns with a lower risk profile than is normally associated with similar

trading strategies.  From January 1996 to July 2005, the Bayou Funds took in an estimated $450

million in deposits from investors.

24.    The Bayou Funds' assets were traded through accounts maintained by Bayou

Securities, which in turn cleared trades through a registered-broker.  Bayou Management

maintained primary bank accounts on behalf of the Bayou Funds at Citibank and then at

Wachovia Bank.

**B.      The Bayou Operating Agreements.**

25.    Following the 2003 liquidation of the Bayou Fund, each of the successor Bayou

Funds was organized as a Delaware limited liability company.  As such, each fund was governed

by an Operating Agreement.  The relevant provisions of the various Operating Agreements were

substantively identical.

26.    The  Operating Agreements permitted the Bayou Hedge Fund Managers to, among

other things, purchase, invest, trade, and sell in capital stock, subscriptions, warrants, bonds,

notes, debentures, convertible, rights, options, puts and calls, and other securities (both equity

and debt) of companies, including financial instruments, indices and derivatives (collectively

referred to as "Securities").  The Operating Agreements also granted the Bayou Hedge Fund

7

Managers complete authority, power, and discretion to make all decisions regarding such matters, and to perform any and all other acts or activities customary or incident to the management of the business of the funds. Israel and Marino, through Bayou Management, were the Managers of the Bayou Funds.

27.     The Operating Agreement also outlined the Managers' duties and obligations relating to the Bayou Funds. The Managers had a duty and an obligation to perform their managerial duties in good faith, in a manner they reasonably believed to be in the best interests of the Bayou Funds, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. According to the Operating Agreements, Managers are liable to Creditors for any loss or damage resulting from fraud, deceit, gross negligence, willful misconduct, or a wrongful taking of funds.

**C.     The Bayou Fraud.**

28.     The Bayou trading strategy proved unsuccessful and within the first several months of operation, the Bayou Fund sustained trading losses. Defendants began concealing volatile swings of trading gains and losses by fabricating results and providing Creditors with false performance summaries. In 1997, Defendants' actual performance failed to meet projections. Defendants, however, hid the Bayou Fund's poor performance from Creditors and potential investors by transferring a portion of trading commissions paid to Bayou Securities back into the fund. As a result, at year-end Creditors and potential investors were under the false impression that Bayou had been profitable.

29.     Throughout 1998, the Bayou Fund sustained millions of dollars of net losses. Defendants concealed these losses by making material misstatements to Creditors. Israel and Marino created false investment reports for Creditors and then used the inaccurate results

8

contained in those reports to create false annual financial statements.

30.     Because Bayou's mounting losses could not withstand the scrutiny of an independent audit, Defendants dismissed their accounting firm in late 1998 and created a fictitious one—Richmond-Fairfield Associates—to pose as an independent auditor.  Bayou was the sole client and Defendant Marino was the sole principal of Richmond-Fairfield Associates. The fictitious accounting firm prepared phony "independent" audit reports that verified Bayou's false financial statements and performance summaries.

31.     The Bayou Funds continued to lose money in 1999 through 2005.  During each of these years, Defendants concealed those losses by creating and distributing false performance summaries and false financial statements ostensibly "audited" by Richmond-Fairfield Associates. With the assistance of Richland-Fairfield Associates, Bayou made a series of false statements regarding the performance of the Bayou Funds, including:

a.     From 2001 through 2005, Bayou distributed annual financial statements and reports to Creditors that contained false financial information and incorporated falsified auditors' reports.  For example, both the 2003 and 2004 annual statements overstated the Bayou Funds' total assets, net income, and gains from investment transactions.

b.     Bayou also frequently distributed quarterly reports to clients, containing materially misleading information including non-existent rates of return.

c.     From 2001 through May 2005, Bayou provided Creditors monthly account statements showing opening and closing capital, profits, and losses for each month. These statements failed to disclose that the Bayou Funds were actually losing money during this time period.

32.     Even though Bayou was concealing substantial losses from 1996 to 2002,

9

Defendants continued to solicit new and current Creditors for additional funds, raising tens of millions of dollars in the process. To attract more capital, Defendants liquidated the Bayou Fund and formed the Bayou Accredited, Bayou Superfund, Bayou No Leverage, and Bayou Affiliates funds in January 2003. According to the SEC, investor deposits subsequently peaked at more than $125 million. The reorganization did not improve profitability and the four new funds continued to lose substantial sums of money, which Defendants continued to conceal.

33.     The Bayou strategy involved large numbers of high dollar value trades, and Bayou Securities, which is wholly-owned by Israel, executed the vast majority of those trades. In the process, Bayou Securities earned substantial commissions that were then distributed to Israel and Marino as salary and profits. As a result of the high commission payments, many profitable trades resulted in net losses for the Bayou Funds. The SEC has alleged that in 2003 the Bayou Funds lost an estimated $49 million while Bayou Securities earned an estimated $29 million in commissions.

34.     In addition to the commissions paid to Bayou Securities, Bayou Management also withdrew "incentive fees" calculated as a percentage of the Bayou Funds' fictitious profits despite the fact that the Operating Agreement granted such fees only when the Bayou Funds were profitable in a given year. The Bayou Funds never earned an actual profit in any year.

**D.     The Unraveling of Bayou.**

35.     Eventually, the trading losses sustained by the Bayou Funds, the high commissions paid to Bayou Securities, redemptions by Creditors, and the incentive fees and profits extracted from Bayou by Israel and Marino outpaced Bayou's ability to attract new investors. To mask this development and to continue to disguise their losses, Defendants began to search for short-term, high-yield investments.

10

36.     In April 2004, Defendants, without informing Creditors, stopped virtually all

trading and liquidated the Bayou Funds.  Israel then invested a substantial amount of Bayou

assets—approximately $180 million—in a series of high risk prime bank instrument trading

programs in Europe.  Over the next 12 months, Israel and Marino undertook a number of bank

transfers that eventually ended with the deposit of approximately $100 million of Bayou funds in

a Wachovia Bank branch in Flemington, New Jersey.  After being alerted by bank officials in

May 2005, the Arizona Attorney General investigated the source of the $100 million and then

commenced a forfeiture action in Arizona state court alleging that the funds were the proceeds of

a fraudulent prime bank instrument scheme.  The Arizona state court ordered seizure of these

funds.

37.     In July 2005, Defendants informed Creditors by letter that the Bayou Funds were

closing and that Creditors would receive 100 percent of their deposits.  A second letter indicated

that partial distributions would begin by mid-August 2005.

38.     In mid-August 2005, Defendants sent Creditors a letter indicating that 90 percent

of their funds would be distributed the following week, with the remainder to be distributed by

the end of August.  Some Creditors did receive checks from Bayou, but when Creditors

attempted to cash them, those checks were returned for insufficient funds.

39.     Following widespread media reports regarding the collapse of the Bayou Funds,

the United States, acting through the United States Attorney for this District, filed its civil

forfeiture action against the Bayou Group and later initiated criminal actions against Israel and

Marino.  These criminal actions sought, among other forms of relief, forfeiture of Israel and

Marino's personal assets and the approximately $100 million of Bayou assets the Arizona

Attorney General had seized.  The SEC and the CFTC followed with their civil law enforcement

11

actions discussed above.

40.    On September 9, 2005, the Kroll Liquidators filed ancillary petitions under § 304

of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut in

aid of their pending liquidation proceedings in the Cayman Islands.  The bankruptcy court

subsequently on October 10, 2005 granted the Kroll Liquidators' request for ancillary relief and

entered a preliminary injunction precluding the commencement or continuation of any judicial or

regulatory proceeding involving the Off-Shore Bayou Funds, or actions against any property in

the United States in which the Kroll Liquidators have an interest.  This injunction, however, does

not apply to any action with respect to the commencement of any claim against the On-Shore

Bayou Funds or a claim against their assets located within the United States that are the subject

matter of this Complaint.

12

## V.   CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Against All Defendants for Violations of Section 10(b) of the 1934 Act and Rule 10b-5

41.   Plaintiff realleges and reincorporates paragraphs 1 through 40 as if fully set forth in this Complaint.

42.   The contractual rights granted to Creditors who invested in the Bayou Funds are securities within the meaning of Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. §78c(a)(10).

43.   Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devises, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit.

44.   As set forth above, Defendants knowingly or recklessly employed devises, schemes, or artifices to defraud, made numerous false and misleading statements of material fact regarding the performance and value of the Bayou Funds to investors and prospective investors including the Plaintiff's members, and engaged in acts, practices or courses of business which operated as a fraud or deceit on investors.

45.   Defendants misrepresented and failed to disclose to Creditors material facts concerning, among other things, the value of the Bayou Funds' holdings, the corresponding net asset value of the Bayou Funds, and the values of the Creditors' interests in the Bayou Funds. These misrepresentations and omissions were repeatedly made to Creditors and potential

investors in numerous communications including, but not limited to, quarterly and monthly reports, weekly newsletters, annual financial statements, and phony "independent" financial audit reports.

46.    Defendants employed, as part of their scheme to defraud, a fictitious accounting firm that they knowingly or recklessly misrepresented to be independent.

47.    Defendants employed, as part of their fraudulent scheme, a classic Ponzi-scheme in which they used new money that they had fraudulently induced new investors to deposit in the Bayou Funds to pay principal and fictitious profits to redeeming investors.

48.    Defendants knew, or were reckless in not knowing, that their conduct was a fraud on Creditors and that the fraud would result in, and did result in, the purchase and sale of securities at inflated prices.

49.    At all times, Defendants possessed accurate information regarding the Fund's actual net asset value and performance.  Defendants knowingly or recklessly disregarded this information in reporting false valuations.

50.    Defendants made the material misrepresentations and omitted material facts with the intent to induce Creditors to purchase and sell securities.  Creditors reasonably and justifiably relied on the misrepresentations and omissions in purchasing and selling the securities.

51.    By reason of their actions, Defendants violated section 10(b) of the 1934 Act (15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

52.    As a direct and proximate result of the Defendant's fraudulent acts, the Committee's members suffered significant losses.  By reason of their actions, the Committee invokes the equitable powers of this Court to seek temporary and permanent equitable relief from the Defendants for the benefit of the Creditors, including, but not limited to (a) the appointment

14

of an equity receiver to manage and control the Bayou Group; (b) a complete accounting of all money deposited by Creditors with the Funds and disbursed by the Funds to any person, including an accounting of all money received or disbursed by any of the Defendants in connection with their fraudulent schemes; and (c) such other equitable relief as the Court believes is just and adequate to remedy the injuries to Creditors.

## SECOND CLAIM FOR RELIEF

### Against All Defendants for Fraud

53.  Plaintiff realleges and reincorporates paragraphs 1 through 52 as if fully set forth in this Complaint.

54.  As set forth above, Defendants committed fraud by knowingly making misrepresentations and omissions of material fact with intent to deceive on which Creditors relied.

55.  Defendants misrepresented and failed to disclose to Creditors material facts concerning, among other things, the value of the Bayou Funds' holdings, the corresponding net asset value of the Bayou Funds, and the values of the Creditors' interests in the Bayou Funds. These misrepresentations and omissions were repeatedly made to Creditors and potential investors in numerous communications including, but not limited to, quarterly and monthly reports, weekly newsletters, annual financial statements, and phony "independent" financial audit reports.

56.  Defendants knew, or were reckless in not knowing, that their conduct was a fraud on Creditors and that the fraud would result in, and did result in, the purchase and selling of securities at inflated prices, and the retention of securities after they otherwise would have been sold.

15

57.   Defendants made the material misrepresentations and omitted to disclose material facts with the intent to induce Creditors to purchase, sell, or retain securities. Creditors reasonably and justifiably relied on the misrepresentations and omissions in purchasing, selling and retaining the securities.

58.   Defendants' fraudulent conduct was done purposefully, maliciously, and without regard for the rights and interest of the Creditors.

59.   As a direct and proximate result of the Defendants' fraudulent acts, the Committee's members suffered significant losses. The Committee therefore invokes the equitable powers of this Court to seek temporary and permanent equitable relief for the benefit of the Creditors, including, but not limited to (a) the appointment of an equity receiver to manage and control the Bayou Group; (b) a complete accounting of all money deposited by Creditors with the Bayou Funds and disbursed by the Bayou Funds to any person, including an accounting of all money received or disbursed by any of the Defendants in connection with their fraudulent schemes; and (c) such other equitable relief as the Court believes is just and adequate to remedy the injuries to Creditors.

### THIRD CLAIM FOR RELIEF

**Against All Defendants for Breach of Fiduciary Duty**

60.   Plaintiff realleges and reincorporates paragraphs 1 through 59 as if fully set forth in this Complaint.

61.   Defendants were fiduciaries of the Creditors because they (1) solicited, received, managed, and controlled the contributions that Creditors made to the Bayou Funds; (2) held themselves out as financial advisors and professional experts in hedge fund investment; and (3) had superior knowledge of hedge funds in general and the Bayou Funds in particular.

16

62.     Creditors reasonably and justifiably placed trust and confidence in the integrity, fidelity, and professionalism of Defendants in connection with the management of the Bayou Funds and the provision of financial and investment advice.

63.     As fiduciaries, Defendants owed Creditors the duties of loyalty, due care, and fair dealing.  Defendants were obligated to act in the best interest of the Creditors, provide Creditors with accurate and materially complete information, and refrain from placing their own interests ahead of those of the Creditors.

64.     Defendants violated their fiduciary duties by, among other things, (1) making numerous material misrepresentations and omissions of fact concerning the performance and net asset value of the Bayou Funds, (2) failing to safeguard the Creditors' assets, (3) providing the Creditors with false and misleading documents, and (4) placing their own interests ahead of the Creditors.

65.     As a direct and proximate result of the Defendants' breach of fiduciary duties, the Committee's members suffered significant losses.  The Committee therefore invokes the equitable powers of this Court to seek temporary and permanent equitable relief for the benefit of the Creditors, including, but not limited to (a) the appointment of an equity receiver to manage and control the Bayou Group; (b) a complete accounting of all money deposited by Creditors with the Bayou Funds and disbursed by the Bayou Funds to any person, including an accounting of all money received or disbursed by any of the Defendants in connection with their fraudulent schemes; and (c) such other equitable relief as the Court believes is just and adequate to remedy the injuries to Creditors.

## VI.     PRAYER FOR RELIEF

Plaintiff Committee prays this Court take the following actions:

17

A.   Appoint a Receiver empowered to take various actions, including: i) marshal any and all assets belonging to the Bayou Group; ii) investigate the books and records of the Bayou Group; ii) prosecute any and all claims belonging to the Bayou Group; iii) develop an orderly plan of liquidation, and iv) develop a fair and equitable plan of distribution of Bayou's assets to those creditors with a legitimate claim to the funds;

B.   Awarding other equitable relief, including: i) an Order requiring Defendants Israel and Marino, to produce an accounting; and ii) a preliminary and permanent injunction precluding all Defendants and others from taking any action that interferes with the actions of this Court's appointed receiver;

C.   Awarding Plaintiff all costs, disbursements, and expenses incurred in prosecution of this action, including attorneys' fees; and

D.   Awarding Plaintiff such other relief as the Court shall deem just and proper.

DATED this 27th day of March, 2006.

Joseph A. Gershman (JG-8275)
KASOWITZ BENSON TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Tel: (212) 506-1770
Fax: (212) 506-1800
Attorneys for Plaintiff

Richard A. Kirby
Philip M. Guess
Scott Lindsay
Joshua C. Gaul
PRESTON GATES ELLIS
   & ROUVELAS MEEDS LLP
1735 New York Avenue, N.W., Suite 500
Washington, D.C. 20006-5209
Tel: (202) 661-3730
Fax: (202) 331-1024
Counsel for Plaintiff

18